*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEMARCUS GEORGIO JUPREE BOLDEN,

        Defendant-Appellant.

UNPUBLISHED
March 21, 2024

No. 362124
Calhoun Circuit Court
LC No. 2019-000303-FC

Before: PATEL, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

Defendant appeals following his jury convictions of one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(c) (penetration during the commission of another felony), one count of breaking and entering without permission, MCL 750.115, and one count of assault with intent to do great bodily harm less than murder, MCL 750.84. The trial court sentenced defendant to serve 135 to 360 months in prison for his CSC-I conviction, 38 to 120 months for his assault conviction, and 90 days for his conviction of breaking and entering.

Defendant now argues on appeal (1) that his right to a speedy trial was violated by the $38^1/_2$-month delay between his arrest and the trial; (2) that he was entitled to resentencing because his CSC-I sentence was disproportionate; (3) that Michigan's 2021 Sex Offender Registration Act (SORA), MCL 28.721 *et seq*., is an unconstitutional ex post facto punishment, and, therefore, he should be removed from the Michigan sex offender registry; (4) that requiring defendant to register as a sex offender for life absent an individualized assessment of risk constituted cruel or unusual punishment; and (5) that his sentence to lifetime electronic monitoring (LEM) constituted cruel and/or unusual punishment as well as an unreasonable search. For reasons explained in this opinion, we affirm.

## I. BASIC FACTS

### A. THE OFFENSE

This case arose from an incident in which defendant entered the victim's house on the pretense of avoiding the police. The defendant's girlfriend was a friend of the victim, and the

-1-

victim had hung out with defendant on past occasions. After entering the victim's apartment, defendant accused the victim of allowing his girlfriend to cheat on him. Defendant then ordered the victim to suck his penis. Defendant then choked the victim, dragged her into the living room, forced her to suck his penis, and ejaculated on the victim's mouth, hair, and face. Defendant then left the victim's apartment, but he returned a few minutes later because he forgot his car keys. The victim did not open the door, so defendant broke into the house through the kitchen window, grabbed his keys, and left the apartment.

Police officers subsequently arrived at the victim's apartment because a neighbor had called and reported that a man and a woman were arguing in the victim's apartment. One of the officers stated that, when he arrived at the victim's apartment, the victim cracked open her door to speak with him. The victim was crying at the time. The victim falsely told the police officers that nothing was wrong and that she was upset because she had discovered that her boyfriend had cheated on her. The victim later admitted that she had lied to the police officers because she was afraid of defendant retaliating against her.

Later that day, the victim went to the hospital for a medical assessment because she had suffered multiple minor bodily injuries. The victim then confessed to the police officers, who were present with her at the hospital, that defendant sexually assaulted her. The victim then underwent a sexual-assault examination, during which the sexual assault nurse examiner collected swabs from the victim's body, including lip and chin swabs, and swabs from the victim's hair. These swabs, along with a DNA swab obtained from defendant, were utilized in a subsequent forensic DNA analysis. The DNA analyst stated that the DNA sample did not fully match defendant's sample, but she opined that, based on a "likelihood ratio," the unknown male DNA belonged to defendant.

## B. PRETRIAL & TRIAL

Shortly after his arrest in January 2019, defendant moved for a speedy trial. Over the next $14^1/_2$ months, the parties engaged in two motion hearings concerning bond for defendant and a preliminary examination but failed to engage in a trial. Unfortunately, the widespread outbreak of COVID-19 in 2020 led to a 24-month extension of the pretrial period. Consequently, the trial did not occur until approximately $38^1/_2$ months after defendant's arrest.

After the trial, the jury found defendant guilty of all charges, and the trial court sentenced defendant, in pertinent part, to 135 to 360 months in prison for his CSC-I conviction with credit for 603 days served, to lifetime electronic monitoring (LEM), and to a lifetime registration as a sex offender, pursuant to the Sex Offenders Registration Act (SORA). See MCL 750.520b(2)(d) and MCL 28.715(13).

Defendant subsequently moved to correct an invalid sentence. Defendant argued that Michigan's 2021 SORA constituted a criminal punishment, meaning that no part of it could be retroactively applied to him; that requiring defendant to register as a sex offender for life without an individualized assessment of risk constituted cruel or unusual punishment; and that defendant's LEM punishment was also cruel or unusual. The trial court denied defendant's motion.

Defendant now appeals.

## II. ANALYSIS

## A. RIGHT TO A SPEEDY TRIAL

Defendant argues that the $38^1/_2$-month delay between his arrest and the trial denied him of his right to a speedy trial. We disagree.

To preserve a speedy-trial issue for appeal, a defendant must make a formal demand for a speedy trial on the record. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). Defendant made such a demand. Therefore, this issue is preserved for appeal.

Whether a defendant was denied a speedy trial is a mixed question of fact and law. *People v Waclawski*, 286 Mich App 634, 664; 780 NW2d 321 (2009). The factual findings are reviewed for clear error, while the constitutional issue is a question of law subject to de novo review. *Id*. In addition, this Court must determine whether any error was harmless beyond a reasonable doubt. *Id*. Violation of the constitutional right to a speedy trial requires dismissal of the charge with prejudice. *Id*. at 664, 665; see MCR 6.004(A).

A criminal defendant's right to a speedy trial is guaranteed by the federal and Michigan constitutions as well as by statute and court rule. US Const, Am VI; Const 1963, art 1, § 20; *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006); MCR 6.004. To determine whether a defendant has been denied his or her right to a speedy trial, this Court balances the following: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Williams*, 475 Mich at 261, 262.

### 1. LENGTH OF THE DELAY

We agree with defendant that the delay between the date of his arrest and the trial was presumptively prejudicial.

The delay period commences at the defendant's arrest. *Id*. at 261. "[T]here is no set number of days between a defendant's arrest and trial that is determinative of a speedy trial claim." *Waclawski*, 286 Mich App at 665. Nevertheless, a delay of more than 18 months is presumptively prejudicial to the defendant and shifts the burden to the prosecution to prove a lack of prejudice. *Williams*, 475 Mich at 262. A presumptively prejudicial delay serves as a "triggering mechanism" and requires this Court to further inquire, by means of the other three factors, into whether a defendant was deprived of his right to a speedy trial. *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972); *People v Simpson*, 207 Mich App 560, 564; 526 NW2d 33 (1994). In this case, defendant was arrested approximately $38^1/_2$ months before the trial, well beyond the 18-month threshold for a presumption of prejudice.

Although presumptively prejudicial, most of the delay is attributable to the outbreak of COVID-19, not to the prosecution.

### 2. REASONS FOR THE DELAY

Delays between a defendant's arrest and the trial can be divided into one of several categories and are typically attributed to the prosecution or the defendant.

For example, unexplained delays are attributed to the prosecutor. *Waclawski*, 286 Mich App at 666. Scheduling delays and delays caused by the court system are also attributed to the prosecutor, but are given a neutral tint and minimal weight. *Williams*, 475 Mich at 263. Delays sought by defense counsel, whether counsel is privately retained or publicly assigned, are ordinarily attributable to the defendant. *Vermont v Brillon*, 556 US 81, 90-91; 129 S Ct 1283; 173 L Ed 2d 231 (2009). The outbreak of COVID-19 added an additional category of delays for this Court to consider. This Court has not yet addressed in a published opinion how courts should consider delays resulting from the COVID-19 pandemic with respect to speedy-trial claims. But we find the federal case of *United States v Smith*, 494 F Supp 3d 772 (ED Cal, 2020), instructive.[1] In *Smith*, 494 F Supp 3d at 783, the federal court stated:

> The Court finds the delay to be neither attributable to the Government nor Smith. Instead, the Court's decision to take responsible, emergency health measures to limit the spread of COVID-19 is responsible for the delay. The Court's inability to safely conduct a jury trial is a good-faith and reasonable justification for the delay. One that does not weigh against the Government.

Accordingly, we conclude that trial delays caused by COVID-19 are not attributable to the prosecution.

The $38^1/_2$-month delay in the present case can be broadly divided into two time periods: Pre-COVID and post-COVID. The post-COVID period lasted approximately 24 months (from March 2020 to March 2022), and the pre-COVID period lasted approximately $14^1/_2$ months (from January 2019 to March 2020). Consequently, as defense counsel admitted, COVID-19 was largely, though not exclusively, the major source of delay given how long the pandemic persisted. As for the pre-COVID period, one month of the delay can be attributed to the fact that the prosecution was awaiting DNA results. We classify this delay as a delay inherent in the system. See *People v Gilmore*, 222 Mich App 442, 460; 564 NW2d 158 (1997). Although this delay is technically attributable to the prosecution, it should be assigned a neutral tint and minimal weight for determining whether defendant was denied a speedy trial. See *id*. Nevertheless, this delay does not account for the additional $13^1/_2$ months of delay for which no explanation has been offered. Therefore, these months should be attributed to the prosecution and should not be given a neutral tint. See *Williams*, 475 Mich at 261.

For these reasons, we attribute $14^1/_2$ months of the delay to the prosecution, 24 months to COVID-19, and none to defendant. Of the months attributed to the prosecution, only one month should be given a neutral tint. Even so, the fact remains that over 62% of the delay (24 months divided by $38^1/_2$ months) was caused by COVID-19, not the prosecution. Therefore, this factor provides very little weight in determining whether defendant was denied his right to a speedy trial.

---

[1] Although a lower federal court's decisions are not binding precedent for this Court, we may find the federal court's reasoning persuasive. See *People v Gillam*, 479 Mich 253, 261; 734 NW2d 585 (2007).

### 3. DEFENDANT'S ASSERTION OF THE RIGHT

In this case, defendant very promptly asserted his right to a speedy trial: in the same month as his arrest. Nevertheless, and notwithstanding the fact that the delay was presumptively prejudicial, we conclude that the delay in defendant's trial was not actually prejudicial to him or to his case.

### 4. PREJUDICE TO THE DEFENDANT

A defendant can experience two types of prejudice while awaiting trial: prejudice to a person and prejudice to the defense. *Williams*, 475 Mich at 264. The latter type of prejudice is the more crucial in assessing a speedy-trial claim. *Id*. This fourth element is critical for this Court's determination whether a defendant's right to a speedy trial was prejudiced. *Cain*, 238 Mich App at 112.

On the question of personal prejudice, defendant asserts that he lost contact with family and friends, lost income opportunities, and suffered anxiety because of the outbreak of COVID-19 within the jail. The United States Supreme Court has stated that "the time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness." *Barker*, 407 US at 532. During the entire delay, the parties engaged in six motion hearings regarding bond for defendant and defendant's repeated violations of his bond conditions. Although it is not clear from the record how much of the $38\frac{1}{2}$ months defendant spent outside of jail, it is clear that defendant spent some of that time working a job and with his family.

As for anxiety, defendant argues that the outbreak of COVID-19 in Michigan's jails and prisons caused him severe anxiety. It remains unclear, however, whether defendant's fears were justified, given that the jail had taken precautions, including social distancing, to prevent the spread of COVID-19. In other words, the only fact that we can be sure of is that defendant was anxious about the spread of COVID-19. This Court has made it clear that anxiety alone remains insufficient to establish a violation of the right to a speedy trial. *Gilmore*, 222 Mich App at 462.

Regarding prejudice to his case, defendant maintains that the delay prejudiced his ability to prepare an adequate defense because, by the time of the trial, witnesses had difficulty remembering important details about the case. In order to establish that his defense was prejudiced, defendant must assert that the potential prejudice to his defense was "actual and substantial to the extent that it meaningfully impaired her ability to defend against the state's charges and, as a result, the disposition of the criminal proceeding was likely affected." *Cain* 238 Mich App at 110 (quotation marks and citation omitted). Although certain witnesses, including the victim, police officers, and defense witnesses had trouble remembering certain details from the case, defendant has failed to show that their lapse of memory impaired his ability to present an adequate defense against the state's charges and likely impacted the case's outcome.

For these reasons, defendant has failed to establish that the delay prejudiced his right to a speedy trial or that this Court should vacate his convictions and dismiss the charges with prejudice.

## B. DEFENDANT'S SENTENCE WAS NOT DISPROPORTIONATE

Defendant argues that the trial court's within-the-guidelines sentencing of defendant was disproportionate to the seriousness of defendant's offense. We disagree.

This Court reviews for an abuse of discretion the trial court's sentencing of defendant to 135 to 360 months in prison. See *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). Such a review requires an examination whether the trial court abused its discretion by "violating the principle of proportionality." *Id*. at 477. Courts review a sentence for reasonableness without regard to whether the trial court sentenced a defendant within the guidelines; whether a sentence is reasonable depends on whether it is disproportionate to the "seriousness of the circumstances surrounding the offense and offender." *People v Posey*, ___ Mich ___, ___; ___ NW2d ___ (2023) (Docket No. 162373); slip op at 3, 4. Under this standard, courts may not render any decisions that fall outside the range of reasonable and principled outcomes. *People v Odom*, 327 Mich App 297, 303; 933 NW2d 719 (2019). Such decisions include those that are "arbitrary or capricious." *People v Grant*, 329 Mich App 626, 635, 637; 944 NW2d 172 (2019).

Although the sentencing guidelines are no longer mandatory, the Michigan Supreme Court has held that, when trial courts depart from sentencing guidelines, "appellate courts must review all sentences for reasonableness . . . ." *Posey*, ___ Mich at ___; slip op at 29. The Court also stated that every sentence "should be tailored to the particular circumstances of the case and the offender in an effort to balance both society's need for protection and its interest in maximizing the offender's rehabilitative potential." *People v McFarlin*, 389 Mich 557; 208 NW2d 504 (1973). See also *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010). In determining a sentence's reasonableness, appellate courts must look to "whether the sentence is proportionate to the seriousness of the matter." *Posey*, ___ Mich at ___; slip op at 29. The Supreme Court first outlined the proportionality test in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990). *Posey*, ___ Mich at ___; slip op at 29. In *Milbourn*, 435 Mich at 656, the Michigan Supreme Court affirmed that the legislative guidelines "represent the actual sentencing practices of the judiciary, and . . . [are] the best 'barometer' of where on the continuum from the least to the most threatening circumstances a given case falls." Overall, "the guidelines reflect the relative seriousness of the different combinations of offense and offender characteristics." *Id*. at 658.

Although sentences that fall within the recommended sentencing guidelines range are presumptively proportionate, the Michigan Supreme Court has recently held that this Court must review "within-guidelines sentences" in accordance with the reasonableness test outlined in *Steanhouse*, 500 Mich at 459, 460. *Posey*, ___ Mich at ___; slip op at 5, 16-19. This test requires that sentences imposed by a trial court be proportionate to the offender and to the gravity of the offense. See *Steanhouse*, 500 Mich at 459, 460. This Court "may" consider the following, nonexhaustive list of factors when determining a sentence's proportionality:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Lampe*, 327 Mich App 104, 126; 933 NW2d 314 (2019) (quotation marks and citation omitted).]

-6-

The trial court sentenced defendant to 135 to 360 months imprisonment, which fell within the guidelines range of 81 to 135 months. See MCL 777.62.

Defendant argues that his sentence was disproportionate because the trial court placed too much weight on his prior criminal history and on the pain suffered by the victim. We disagree.

## 1. OFFENSE VARIABLES

Despite defense counsel's arguments to the contrary, the trial court did not abuse its discretion by considering the victim's mental and physical injuries when it sentenced defendant. The trial court assigned defendant 10 points under Offense Variables (OVs) 3 and 4. Defendant correctly observes that the trial court considered these variables in establishing the guidelines range of 81 to 135 months. Defendant has failed, however, to establish that the trial court's assignment of 10 points under both OV 3 and OV 4 constituted an abuse of discretion.

OV 3 deals with physical injury to a victim and requires an assessment of 10 points in offenses involving "[b]odily injury requiring medical treatment occurred to a victim." MCL 777.33(1)(d).

In *People v Barnes*, 332 Mich App 494, 497; 957 NW2d 62 (2020), the defendant was convicted of CSC-I, and the trial court sentenced the defendant to serve 42 to 80 years in prison for each conviction. The defendant's minimum sentence exceeded the guidelines minimum sentence range of $10^1/_2$ to 35 years in prison. *Id*. at 498. As part of the sentencing process, the trial court assigned defendant 10 points under OV 3. *Id*. at 499. This Court concluded that the trial court's assessment of 10 points under OV 3 was proper because the victim had suffered a physical injury, namely sexual assault, that required her to be transported to a hospital for a forensic medical examination. *Id*. at 500. Although the nurse could not confirm that the injuries on the victim were the result of sexual assault, the nurse concluded that the injuries were consistent with sexual assault and proscribed emergency contraceptives to the victim. *Id*.

As for physical harm, this case strongly mirrors the fact pattern of *Barnes*, 332 Mich App at 500, wherein the victim was physically assaulted, requiring her to be transported to the hospital for a medical examination. Likewise, the present victim was transported to a hospital for a forensic medical examination. Although the DNA analyst could not confirm that defendant had sexually assaulted the victim, she indicated that defendant was likely the victim's assailant. See *id*. Moreover, as the nurse explained in detail, the victim suffered multiple injuries to her body.[2]

OV 4 concerns "psychological harm to a victim" and requires an assessment of 10 points in offenses involving "[s]erious psychological injury requiring professional treatment [that] occurred to a victim." MCL 777.34(1)(a).

---

[2] The nurse testified to numerous lacerations and bruises on the victim's neck, face, ear, breast, arm and back, including "a petechiae [i.e., capillaries broken under the skin] in the roof of her mouth."

In *People v Lawhorn*, 320 Mich App 194, 196, 211; 907 NW2d 832 (2017), a trial court convicted a defendant of third-degree child abuse and sentenced the defendant to "365 days in jail . . . and 60 months' probation," which constituted a "one month" increase from the sentencing guidelines range. The trial court assigned the defendant 10 points under OV 4. *Id*. at 210. The trial court justified its holding on the grounds that the guidelines accounted for only "some degree of the harm the victim suffered . . . ." *Id*. This Court found the trial court's justification persuasive, stating, "[I]t was reasonable . . . to conclude that the factors [that the trial court] considered, especially the effects of defendant's behavior on the victim that culminated in his stabbing another child and saying that he hated his life and that nobody loved him, were not adequately considered in the guidelines calculation." *Id*. at 210, 211.

Like the victim in *Lawhorn*, 320 Mich App at 210, 211, the victim in this case suffered immense psychological harm. The victim testified that defendant's abuse seriously undermined her physical and mental health: her doctor diagnosed her with post-traumatic stress disorder, she was unable to keep a steady job, and she was unable to have her own house. Two police officers testified that the victim appeared very upset when they spoke with her. To add insult to injury, defendant's family and friends harassed the victim. As the trial court explained at sentencing, this horrific incident marked a profound, lifechanging event for the victim during which she was attacked and strangled in her own home. Also, the fact that the victim had to seek professional help, such as counseling, also supports the trial court's conclusion regarding the severity of her psychological suffering.

Additionally, unlike the situations in *Lawhorn*, 320 Mich App at 196, 211, and *Barnes*, 332 Mich App at 497, 498, wherein the defendants were sentenced outside the guidelines range, in this case, defendant was sentenced within the guidelines range. Under these circumstances, defendant has failed to overcome the presumption that his sentence was reasonable considering the points assigned to him by the trial court under OV 3 and OV 4.

## 2. DEFENDANT'S CRIMINAL HISTORY

Defendant has wrongly asserted that the trial court erred by considering defendant's prior arrests, which did not result in convictions, when it sentenced him.

This Court has stated that "[u]nder the sentencing guidelines, the recommendation for a defendant's minimum sentence is determined in significant part by the defendant's criminal history." *People v Young*, 276 Mich App 446, 454; 740 NW2d 347 (2007). As part of the guidelines' calculation process, trial courts consider a defendant's prior offenses. See MCL 777.21(1). Such offenses can include felonies or misdemeanors. See *Young*, 276 Mich App at 454. Overall, "[w]hen calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a [presentence investigation report]." *People v Wellman*, 320 Mich App 603, 608; 910 NW2d 304 (2017) (quotation marks and citation omitted; second alteration in original). This Court has also stated that, when imposing sentence, trial courts "may consider other criminal activity for which no conviction resulted, provided that defendant has an opportunity for refutation." *People v Williams*, 111 Mich App 818, 825; 314 NW2d 769 (1981).

Therefore, the trial court did not err by considering all defendant's criminal history, including his misdemeanors and his arrests, which did not result in convictions, when sentencing

defendant. Defendant had an opportunity for refutation, but defendant's criminal history, which included one conviction and several arrests for domestic violence, provided a crucial component of the trial court's justification for defendant's sentence.

In summary, defendant's 135-month sentence for his CSC-I conviction was not disproportionate, and he is not entitled to resentencing.

## C. EX POST FACTO PUNISHMENT

Defendant correctly asserts that the 2021 SORA constitutes a criminal punishment, notwithstanding the Legislature's intent to the contrary, but it does not constitute an ex post facto punishment.

"In order to preserve a claim that a defendant's sentence is unconstitutionally cruel or unusual, the defendant must first raise the claim in the trial court." *People v Lymon*, 342 Mich App 46, 62; 993 NW2d 24 (2022). Defendant raised this issue before the trial court in his motion to correct an invalid sentence. Therefore, defendant preserved this issue on appeal.

This Court reviews preserved questions of constitutional error de novo. *People v Brown*, 294 Mich App 377, 389; 811 NW2d 531 (2011). "A statute is presumed to be constitutional, and courts will construe a statute as constitutional unless its unconstitutionality is plainly apparent." *People v Malone (On Remand)*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 331903); slip op at 4. "The party challenging the statute's constitutionality has the burden of proving its invalidity." *Id.* "When a party asserts a facial challenge to the constitutionality of a statute, the party must demonstrate that no circumstances exist under which the statute would be valid." *People v Dillon*, 296 Mich App 506, 510; 822 NW2d 611 (2012).

The Michigan Legislature enacted SORA in 1994 to assist law enforcement with preventing convicted sex offenders from reoffending. *People v Betts*, 507 Mich 527, 533; 968 NW2d 497 (2021). Within the succeeding decades, SORA experienced a series of amendments. See *id.* at 533-536. Most recently, SORA was amended in 2020 and is currently referred to as "the 2021 SORA." *Lymon*, 342 Mich App at 65. Although some of the 2020 changes to SORA were ameliorative, other changes were more restrictive. *Id.*

Pursuant to SORA, defendant is considered a "Tier III" offender because he was convicted of CSC-I. See MCL 28.722(v)(*iv*). Consequently, defendant is subject to mandatory sex offender registration for life under MCL 28.725(13) (reporting requirements for registered individuals and Tier III offenders). Accordingly, the trial court required defendant to register as a sex offender for life.

Defendant argues that he should be removed from the sex offender registry because Michigan's 2021 SORA represents unconstitutional ex post facto punishment. We disagree.

The United States Constitution prohibits ex post facto laws. *Betts*, 507 Mich at 542; see US Const, art I, § 10; Const 1963, art 1, § 10. A law is ex post facto if it: "(1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a [committed] crime; or (4) allows the prosecution to convict on less evidence." *Betts*, 507 Mich at 542 (quotation marks and citation omitted; alteration in

original). Examining whether a law falls under the third category of ex post facto laws requires a two-pronged analysis. *Id*. For the first prong of this analysis, we will determine whether the Legislature intended SORA to be a criminal punishment or a civil remedy. *Id*. If the Legislature intended for SORA to be a criminal punishment, "the retroactive application of such a statute violates the ex post facto prohibitions, and the inquiry ends." *Id*. at 543. However, if the Legislature intended for the statute to serve as a civil remedy, this Court must determine "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id*. (quotation marks and citation omitted).

### 1. MICHIGAN'S 2021 SORA CONSTITUTES A CRIMINAL PUNISHMENT

Although the Legislature intended for the 2021 SORA to be a civil remedy, defendant has correctly asserted that the statute constitutes a criminal punishment.

The United States Supreme Court has stated that, when determining whether a statute's scheme is truly punitive in purpose or effect, the following factors are especially relevant:

> "[W]hether, in its necessary operation, the regulatory scheme: [1] has been regarded in our history and traditions as a punishment; [2] imposes an affirmative disability or restraint; [3] promotes the traditional aims of punishment; [4] has a rational connection to a nonpunitive purpose; or [5] is excessive with respect to this purpose." [*Id*. at 545, quoting *Smith v Doe*, 538 US 84, 97; 123 S Ct 1140; 155 L Ed 2d 164 (2003) (alterations in *Betts*).]

If a defendant can establish, by means of these factors, that a statute's punitive effect negated the Legislature's intent to deem the statute a civil regulation, a defendant must next demonstrate that the punishment of being required to comply with the statute constituted "cruel and/or unusual punishment." *Lymon*, 342 Mich App at 81.

In *Lymon*, this Court concluded that, although the Michigan Legislature intended for the 2021 SORA's aggregate punitive effective to be civil, the act imposes a criminal punishment on a sex offender registrant. *Id*. at 70, 81. In its analysis, this Court considered the following factors: (1) whether SORA has been regarded in our history and traditions as a criminal punishment, (2) how the 2021 SORA effects are felt by those subject to it, (3) whether the 2021 SORA promotes traditional aims of punishment, (4) whether the 2021 SORA has a rational connection to a nonpunitive purpose, and (5) whether the regulatory means selected are reasonable, given the Legislature's nonpunitive objective. *Id*. at 71-79. Regarding SORA 2021, this Court concluded that (1) the 2021 SORA continues to bear a significant resemblance to the traditional punishments of shaming and parole because it publishes information about the registrant and encourages social ostracism; (2) it imposes significant affirmative obligations on registrants by requiring, on pain of imprisonment, that they report common life changes within a brief period of time; (3) it promotes the traditional aims of punishment because it seeks to protect the public through deterrence and because its restrictions support retribution; (4) like the 2011 SORA, the 2021 SORA encourages the nonpunitive purpose of public safety by identifying sex offenders who might resume their illicit activities and alerts the public to such dangers; and (5) given the uncertainty surrounding the 2021 SORA's effectiveness at decreasing recidivism, the restraints it imposes are excessive,

notwithstanding the fact that they are fewer in number than the restrictions in the 2011 SORA. *Id*. at 75, 77-79, 81.

For these reasons, defendant correctly asserts that the 2021 SORA constitutes a criminal punishment. Defendant has failed to establish, however, that requiring him to register as a sex offender for life constituted a cruel or unusual punishment.

## 2. REQUIRING DEFENDANT TO REGISTER AS A SEX OFFENDER FOR LIFE WAS NOT CRUEL OR UNUSUAL

"The Michigan Constitution prohibits cruel or unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel and unusual punishment, US Const, Am VIII." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011). If a punishment satisfies the Michigan Constitution's restrictions on cruel or unusual punishment, it necessarily satisfies the more lenient requirements of the United States Constitution. *Id*. The Michigan Supreme Court has stated that, generally speaking, sentences "should be tailored to the particular circumstances of the case and the offender in an effort to balance both society's need for protection and its interest in maximizing the offender's rehabilitative potential." *People v McFarlin*, 389 Mich 557, 574; 208 NW2d 504 (1973). For determining whether a punishment is cruel or unusual, courts examine whether the punishment was unjustifiably disproportionate to the offense by considering the following factors:

> (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. [*Lymon*, 342 Mich App at 82.]

### a. HARSHNESS OF DEFENDANT'S PENALTY

Defendant's sentence was not unjustifiably disproportionate to the gravity of his offense.

Because defendant was convicted on a charge of CSC-I, defendant is subject to lifetime mandatory sex offender registration. See *People v Jarrell*, 344 Mich App 464, 473, 487; 1 NW3d 359 (2022);[3] MCL 28.722(v)(*iv*); MCL 28.725(13). In *Jarrell*, 344 Mich App at 472-473, the defendant was convicted of CSC-I for sexually penetrating the victim. The defendant made credible threats of harm to the victim, which led the victim to believe that she owed the defendant a debt, that she was being watched, and that defendant would harm or kill the victim or her

---

[3] The Michigan Supreme Court has held the application for leave to appeal in abeyance regarding *People v Jarrell* pending its decision in *People v Lymon* (Docket No. 164685). The application for leave to appeal was granted on January 11, 2023, regarding "whether requiring a defendant to register as a sex offender under the Sex Offenders Registration Act (SORA) . . . for a non-sexual crime, such as unlawful imprisonment of a minor, constitutes cruel or unusual punishment under Const 1963, art 1, § 16 or cruel and unusual punishment under US Const, Am VIII."

daughter. *Id*. at 468-472. This Court stated, "Amid this ongoing restraint—reinforced by significant psychological pressure and the frequent display of weapons—[the defendant] orally and vaginally penetrated the victim without her consent." *Id*. at 485. This Court concluded that the trial court's imposition of lifetime SORA registration on the defendant was not unduly harsh, given the "heinous facts underlying [the defendant's] convictions" and because the defendant faced a statutory maximum life sentence for his convictions. *Id*.

In this case, defendant forced the victim to perform oral sex on him against her will and in her own home; he brutally attacked her, strangled her, and reentered her house after raping her, which likely caused the victim additional trauma. The trial court found that defendant's offense had been an extremely negative and "life changing event" for the victim. Just before the trial court sentenced defendant, the victim testified in detail regarding the horrendous physical and psychological suffering that she endured because of defendant's offense against her. She asked the trial court to consider her suffering when it sentenced defendant. Although the defendant's sentence to electronic monitoring will last for the remainder of his life, it is reasonable to assume, given the immense trauma that defendant's offense created, that the victim has also been sentenced to years of mental suffering and hardship, from which she may never fully recover. The only difference between the two parties in this case is that the victim, unlike defendant, did nothing to merit her lifetime sentence.

For these reasons, just as this Court stated in *Jarrell*, defendant's lifetime registration requirement is not unjustifiably disproportionate to his offense.

### b. DEFENDANT'S PENALTY RELATIVE TO OTHER MICHIGAN PENALTIES

Defendant's mandatory lifetime sex offender registration is not unduly harsh in light of other penalties imposed for other offenses in Michigan. See *id*. at ___; slip op at 11. Defendant argues that there are no other postincarceration sentences in Michigan that last for the offender's lifetime. However, in *Malone*, ___ Mich App at ___; slip op at 6, and *Jarrell*, 344 Mich App at 486, this Court stated that sentences mandated by the Legislature are presumptively proportional and presumptively valid, meaning that they are presumptively not cruel or unusual. Moreover, this Court stated that lifetime registration is not the only mandatory penalty imposed in Michigan. *Malone*, ___ Mich App at ___; slip op at 6.

> Mandatory lifetime imprisonment is the penalty imposed for first-degree murder, MCL 750.316(2). Two years' imprisonment is the mandatory punishment for the possession of a firearm during the commission of a felony, MCL 750.227b(1). A second conviction results in the mandatory punishment of five years' imprisonment, and a third conviction is subject to a mandatory 10-year period. *Id*. Additionally, certain CSC-I convictions may impose a mandatory 25-year minimum sentence, MCL 750.520b(2)(b), or a mandatory life sentence, MCL 750.520b(2)(c). [*Malone*, ___ Mich App at ___; slip op at 6.]

Despite defendant's argument that postincarceration life sentences are unique and rarely applied in Michigan, defendant has not presented any evidence to overcome the presumption that his legislatively mandated sentence was proportional to his offense.

-12-

c. COMPARISON TO OTHER STATES

The penalty imposed for defendant's offense in Michigan, relative to the penalty imposed for the same offense in other jurisdictions, does not weigh in defendant's favor.

In *Malone*, ___ Mich App at ___; slip op at 7, the defendant argued that only 18 states have substantially implemented the federal Sex Offenders Registration and Notification Act (SORNA), 42 USC 16901 *et seq.*, that there was no consensus that these registries served to improve public safety, and research indicated that the dangerousness of sex offenders had been previously exaggerated. See *People v Betts*, 507 Mich 527, 560; 968 NW2d 497 (2021). In this case, defendant similarly argued that only 18 states have implemented the federal SORNA act; that the danger posed to the public by sex offenders has been overblown; that Michigan falls into a minority of states that have substantially implemented SORNA; and that Michigan is unique among those states that have implemented SORNA because lifetime registration is a mandatory condition, notwithstanding the fact that defendant was never assessed as posing a future risk to children. Defendant also argues that, in several states, obligations regarding lifetime registration are discretionary, depending on a registrant's risk of recidivism. Nevertheless, this Court stated in *Jarrell*, 344 Mich App at 486, that many states other than Michigan have a tiered system for sex offender registration, wherein lifetime registration is reserved for "the most heinous perpetrators of sexual assault."

Additionally, defendant's arguments ignore the fact that the trial court in this case, like the trial court in *Malone*, ___ Mich App at ___; slip op at 5, applied an individualized approach "pertaining to [defendant's] own circumstances." In *Malone*, the defendant was charged with CSC-I and permitted to plead to CSC-II. *Id*. at ___; slip op at 2-3. The defendant was also remanded to a juvenile facility for treatment. *Id*. at ___; slip op at 3. In the present case, the trial judge determined that there was no justification at that time to run defendant's sentences consecutive, despite the recommendation of probation. The trial court also considered defendant's felonies and misdemeanors as well as the fact that there was a pretrial period when defendant had not been in trouble and had complied with the trial court's orders. All these facts suggest that the trial court gave defendant an individualized assessment of his risk to reoffend. See *id*. at ___; slip op at 7.

For these reasons, defendant has failed to establish that the penalty imposed for his offense in Michigan constituted cruel or unusual punishment in light of other jurisdictions' penalties for the same offense.

d. THE GOAL OF REHABILITATION

This Court has conclusively stated that lifetime registration for sexual offenders does not advance the justice system's overall goal of rehabilitation. *Id*. at ___; slip op at 8; *Jarrell*, 344 Mich App at 486.

Nevertheless, because the other three factors weigh against defendant, defendant has failed to establish that his sentence to lifetime registration was cruel or unusual. See *Malone*, ___ Mich App at ___; slip op at 5-8; *Jarrell*, 344 Mich App at 485-487.

## D. LIFETIME ELECTRONIC MONITORING

Lastly, defendant argues that his sentence to LEM constituted a cruel or unusual punishment and an unreasonable search. We disagree.

"In order to preserve a claim that a defendant's sentence is unconstitutionally cruel or unusual, the defendant must first raise the claim in the trial court." *Lymon*, 342 Mich App at 62. The same standard applies for the preservation of constitutional issues in general. See *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021). Defendant raised this issue before the trial court in his motion to correct an invalid sentence. Therefore, defendant preserved this issue on appeal.

This Court reviews preserved questions of constitutional error de novo. *Brown*, 294 Mich App at 389. "A statute is presumed to be constitutional, and courts will construe a statute as constitutional unless its unconstitutionality is plainly apparent." *Malone*, ___ Mich App at ___; slip op at 4. "The party challenging the statute's constitutionality has the burden of proving its invalidity." *Id.* "When a party asserts a facial challenge to the constitutionality of a statute, the party must demonstrate that no circumstances exist under which the statute would be valid." *Dillon*, 296 Mich App at 510.

### 1. CRUEL OR UNUSUAL PUNISHMENT

This Court has concluded that the Legislature " '*intended mandatory [LEM] to be an additional punishment* and part of the sentence itself when required by the CSC-I or CSC-II statutes.' " *People v Hallak*, 310 Mich App 555, 571; 873 NW2d 811 (2015), overruled on other grounds 499 Mich 879 (2016), quoting *People v Cole*, 491 Mich 325, 335-336; 817 NW2d 497 (2012). This Court has also concluded that "lifetime monitoring would help to protect potential victims from defendant, who in turn would likely be deterred from engaging in such acts if he were closely monitored. Accordingly, when employing an as-applied standard under the state Constitution, lifetime electronic monitoring is not cruel or unusual punishment." *Hallak*, 310 Mich App at 577. Moreover, LEM does not constitute cruel or unusual punishment as applied to defendant.

### a. HARSHNESS OF DEFENDANT'S PENALTY

MCL 791.285(3) defines LEM as a device "by which, through global positioning system satellite or other means, an individual's movement and location are tracked and recorded." There is no statutory provision for "any kind of discretion with respect to, review of, or relief from the required monitoring." *Hallak*, 310 Mich App at 568. Although LEM is certainly a great burden to a defendant, defendant has failed to show how his physical burden outweighs the physical and psychological harm suffered by the victim, whom defendant raped and strangled in her own home. Despite his burden, LEM will allow defendant to travel, work, and engage in his community. In other words, defendant will still be able to live a relatively normal life. Consequently, defendant's sentence to LEM was not unjustifiably disproportionate to his offense.

### b. DEFENDANT'S PENALTY RELATIVE TO OTHER MICHIGAN PENALTIES

Defendant's sentence to LEM is a lenient punishment compared to life imprisonment which can be imposed for other serious crimes in Michigan such as first-degree murder, MCL 750.316; second-degree murder, MCL 750.317; armed robbery, MCL 750.529; kidnapping, MCL 750.349; and arson, MCL 750.72.

### c. COMPARISON TO OTHER STATES

As this Court stated in *Hallak*, 310 Mich App at 575, many states have imposed LEM as a penalty for various CSC crimes. Moreover, at least 11 states, including Michigan, have mandated LEM for defendants convicted of the most serious CSC offenses (CSC offense against a minor). *Id*. Society has a legitimate interest in preventing individual offenders from causing further injury to society. *Id*. at 575, 576. Moreover, "at least 10 states besides Michigan have determined that mandatory lifetime electronic monitoring is of value in ensuring such protection." *Id*. at 576. Although the risk of recidivism for sex offenders may not be as severe as this Court previously believed, neither the Michigan Supreme Court nor this Court has denied that a risk of recidivism for sexual offenders exists. See *Betts*, 507 Mich at 560; *Hallak*, 310 Mich App at 575. The record for this case indicates that defendant's raping of the victim was not his first violent encounter with a woman.[4] The trial court considered defendant's prior criminal history, which included several domestic-violence arrests and one domestic-violence conviction from 2012. In other words, there was a risk of recidivism on the part of defendant. The trial court did not make it explicitly clear how much of a role this risk played in its sentence of defendant, however.

### d. THE GOAL OF REHABILITATION

Unfortunately, this Court has not yet explored in a published opinion whether LEM undermines the goal of criminal rehabilitation. See *Hallak*, 310 Mich App at 555.

Nevertheless, in light of the first three considerations, defendant has failed to establish that his particular sentence to LEM constituted cruel or unusual punishment.

### 2. UNREASONABLE SEARCH

Defendant has also failed to establish that his sentence constituted an unreasonable search.

This Court has stated that "the placement of an electronic monitoring device to monitor defendant's movement constitutes a search for purposes of the Fourth Amendment." *Hallak*, 310 Mich App at 579; see US Const Am IV. Determining a search's reasonableness requires a court to balance the interests of the public in searching for evidence of criminal activity against an individual's interest in maintaining their right to privacy. *Hallak*, 310 Mich App at 579. This Court determined that "the strong public interest in the benefit of monitoring those convicted of

---

[4] On one occasion that occurred after the incident at issue in this case, defendant was arrested, though not convicted, for lying to a police officer and for engaging in domestic violence with the mother of his child.

CSC-II against a child under the age of 13 outweighs any minimal impact on defendant's reduced privacy interest." *Id*. at 581. Because this case concerns a CSC-I conviction, this case involves a more serious offense than the crime at issue in *Hallak*. Therefore, this Court's ruling in *Hallak* would plainly apply to defendant's offense.

Consequently, defendant's sentence to LEM did not constitute an unreasonable search.

Affirmed.

/s/ Sima G. Patel
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney